UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ARRM, a Minnesota non-profit
association incorporated under the laws of
Minnesota, on behalf of itself and its
members; and,

Minnesota Organization for Habilitation
and Rehabilitation (MOHR), a Minnesota
non-profit association incorporated under
the laws of Minnesota, on behalf of itself
and its members; and,

Karla Dee Marder, by her guardian Judy
Marder; Robert Clapper, by his guardian
James Clapper; Kathryn Smith, by her
guardian Gerald Smith; Cara Pedrille, by
her guardian Nino Pedrille, on behalf of
other waiver recipients similarly situated,

      Plaintiffs,

    v.

Emily Johnson Piper, in her Official
Capacity as Commissioner of the
Minnesota Department of Human
Services,

      Defendant.

Civil No. _____

**VERIFIED CLASS ACTION
COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF**

---

    Plaintiffs ARRM and MOHR, on behalf of their members; and, Karla Dee Marder,

Robert Clapper, Kathryn Smith, and Cara Pedrille, on behalf of other waiver recipients

similarly situated (hereinafter jointly referred to herein as "Plaintiffs"), for their Verified

Complaint for Declaratory Judgment and Injunctive Relief, state and allege as follows:

1

**INTRODUCTION**

1.      Plaintiffs bring this action to enjoin Defendant Commissioner of the Minnesota Department of Human Services Emily Johnson Piper from implementing an unlawful 7% funding cut that impacts all waiver service payment rates set under the Minnesota Disability Waiver Rate System ("DWRS").

2.      Defendant wrongly assumes that she and her agents at the Minnesota Department of Human Services ("DHS") hold the authority to circumvent, erase or ignore three legislatively-mandated Session Laws passed in 2013 and 2014 that confer waiver service rate increases on the Plaintiffs.

3.      If this Court does not enjoin the Defendant Commissioner's unlawful 7% cut, her agents at DHS will deprive Plaintiffs of their property interests by reducing waiver funding for payment rates below the amounts authorized and conferred by law.

4.      Defendant's agents at DHS have announced that their first round of 7% funding cuts is scheduled for July 1, 2018 and that the final round of 7% cuts are scheduled for December 31, 2019, about 18 months from the filing of this action.

5.      Defendant's agents announced the 7% cuts on or about May 24, 2018, shortly after Governor Mark Dayton vetoed an Omnibus Bill that included a bill which would have repealed by amendment and replaced the funding directly attributable to the 2013 and 2014 session laws.

6.      The fundamental flaw in Defendant's unlawful 7% cut is that because Governor Dayton vetoed a repealer amendment, the waiver funding laws targeted for repeal remains in effect and enforceable.

2

7.     Defendant's agents at DHS assert the July 1, 2018 round of 7% cuts will immediately reduce 27% of the funding that Plaintiffs allege is necessary to set DWRS waiver service payment rates in accordance with law.

8.     Upon information and belief, according to fiscal notes, Defendant's 7% cuts will reduce state and federal Medicaid waiver funding by $36,857,000 in state fiscal year 2019, and by $46,192,000 in state fiscal year 2020.

9.     Unless enjoined by this Court or otherwise rectified by future legislative action, as a result of this unlawful 7% cut, the reductions in waiver funding will perpetuate and increase at least over the next several years.

10.     Defendant's 7% cuts will negatively impact more than 32,000 waiver recipients and their providers, all of whom have their waiver service payment rates set under DWRS.

11.     In addition to the rounds of 7% cuts scheduled for July 1, 2018 and December 31, 2019, Defendant asserts she will also cut waiver service payment rates throughout the next year and a half.

12.     These intermittent 7% cuts will occur if and when members of the putative Plaintiff Class switch to new waiver services, or experience some other life change that materially alters the DWRS waiver services rates previously approved by DHS.

13.     Defendant's unlawful 7% cuts will irreparably harm the Plaintiffs by reducing their waiver service rates below the amounts required by law.

3

14.    Minnesota is currently facing a severe workforce labor shortage crisis.  This crisis impairs the ability of members of ARRM and MOHR to attract or retain the staff needed to provide services to the members of the putative Plaintiff Class.

15.    If not enjoined, Defendant's 7% cuts will aggravate this workforce crisis by jeopardizing Plaintiffs' respective abilities to provide-- and receive -- necessary waiver services.

16.    Upon information and belief, Defendant's 7% cuts reduce Minnesota's DWRS waiver funding below the levels necessary to satisfy the representations and obligations undertaken by DHS pursuant to the *Olmstead* Plan approved by this Court.

17.    Plaintiffs bring this action under 42 USC §1983 to protect specific property rights conferred on Plaintiffs by three specific state statutory amendments enacted by the Legislature and passed into law from 2013 through 2014.

18.    Defendant's 7% funding cuts will deprive Plaintiffs of protected property rights, without due process of law or just compensation.

19.    Defendant's 7% funding cuts also violate Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 and 12131 *et seq* and Section 504 of the Rehabilitation of 1973, 29 U.S.C. § 794, and their respective implementing regulations, by slashing waiver funding below the levels necessary to meet DHS's integration commitments and related obligations required under *Olmstead v L.C.* and the Minnesota *Olmstead* Plan.

4

## PARTIES

## ARRM AND ITS MEMBERS

20.    Plaintiff ARRM is a nonprofit association of more than 200 providers, businesses and interested stakeholders.  ARRM is dedicated to leading the advancement of Minnesota's home and community-based service programs that support people living with disabilities in their pursuit of meaningful lives.

21.    ARRM members include non-profit and for-profit entities licensed under Minn. Stat. ch. 245D.  They are also certified to provide home and community-based services to Minnesotans enrolled under the various federal Medicaid waivers covered by the Minnesota Health Care Program.  ARRM has associational standing to advance the claims of its members, and the persons they serve.

22.    ARRM's members, and other similar residential and in-home support waiver service providers, provide waiver services to waiver recipients similarly situated to Karla Dee Marder, Robert Clapper, Kathryn Smith, and Cara Pedrille.

23.    ARRM's members face immediate, concrete harm if Defendant is not enjoined from cutting waiver funding by 7% on July 1, 2018; or thereafter as Service Agreements are amended when recipients switch to new services; or thereafter, when Defendant implements her last scheduled round of 7% cuts on December 31, 2019.

24.    ARRM brings this declaratory judgment and injunctive relief action on behalf of all its members who provide home and community based services and whose DWRS waiver payment rates will be cut by 7%.

25.      ARRM's Senior Director of External Affairs is Barb Turner. Ms. Turner has reviewed the allegations herein, and has signed her verification, below. Ms. Turner has also provided a separate Declaration in support of this action.

## MOHR AND ITS MEMBERS

26.      MOHR is an association of more than 100 members who provide services to persons with disabilities. MOHR is a non-profit corporation organized under the laws of Minnesota and has associational standing to advance the claims of its members and the persons they serve. MOHR's members include providers of Day Training and Habilitation waiver services (hereinafter referred to as "DT&H").

27.      A DT&H provider is company, nonprofit organization, agency or individual that runs a day program licensed under Minn. Stat. 245D for adults with disabilities, or which provides and arranges for waiver recipients' employment opportunities out among the various Minnesota communities.

28.      Such DT&H services typically help persons with disabilities learn and use life skills, participate in community life, and participate in meaningful activities, such as work, training or recreation.

29.      MOHR's members face immediate, concrete harm if Defendant cuts waiver funding by 7% on July 1, 2018; or thereafter as Service Agreements are amended as recipients sign up for new services; or finally, on the last round of anticipated 7% cuts set for December 31, 2019.

30.     MOHR brings this declaratory judgment and injunctive relief action on behalf of all its members who provide home and community based services and whose DWRS waiver payment rates will be cut by 7%.

31.     The Co-Chair of MOHR's Government Relations Committee is Ms. Lynn Noren.  Ms. Noren has reviewed the allegations herein, and has signed her verification, below.  Ms. Noren has also provided a Declaration in support of this action.

## REPRESENTATIVE PLAINTIFFS

32.     Plaintiffs Karla Dee Marder, Robert Clapper, Kathryn Smith and Cara Pedrille are hereinafter referred to jointly as the "Representative Plaintiffs."

33.     The Representative Plaintiffs each have their own respective guardians, each of whom has approved that their son or daughter may appear herein as a party plaintiff.  When helpful to explain their circumstances more fully, some Representative Plaintiff's guardians have provided Declarations in support of temporary and injunctive relief.

34.     The timing of the cuts that will be sustained by the Representative Plaintiffs depends on whether their waiver services are "banded" or "unbanded" under DWRS. The DWRS concept of banding is explained in paragraphs 56 through 67 herein, and in the supporting Declarations of Barb Turner and Lynn Noren.

35.     Plaintiff Karla Dee Marder is a person with disabilities who began receiving home and community based waiver services in a Community Residential Setting prior to January 1, 2014.  Plaintiff Marder receives waiver services from Living Well Disability Services, which is a member of ARRM.

36.    Plaintiff Marder's mother, Judy Marder, is her guardian.

37.    Unless enjoined, Plaintiff Marder's rate for services received from Living Well will be cut by 7% on December 31, 2019.  That cut is estimated to yield an annualized waiver rate reduction of over $8,000.

38.    Plaintiff Robert Jonathan Clapper is a person with disabilities who receives home and community based waiver services in an Individualized Housing Option setting.

39.    Plaintiff Clapper also receives DT&H services from Merrick, Inc., a member of MOHR.  Plaintiff Clapper started with a center-based employment program, but is now on a mobile work crew that travels to Grand Avenue in St. Paul where he provides janitorial services.

40.    Plaintiff Robert Clapper's guardian is his father, James Clapper.

41.    Plaintiff Robert Clapper's waiver funding budget and all approved payment rates for services are set and established by Defendant's agents at DHS.

42.    Robert Clapper's DT&H waiver services are currently banded, but will be cut by 7%, when he transfers to new employment services on or about October 1, 2018.

43.    Plaintiff Kathryn Smith is a person on the autism spectrum who began receiving home and community based waiver services prior to January 1, 2014.

44.    Kathryn Smith lives in a Community Residential Setting named Harmony Homes.

45.    Plaintiff Smith's father Mr. Gerald Smith is her guardian.

46.    Mr. Gerald Smith is concerned for his daughter's well-being because representatives of Harmony Homes have informed him that if the Defendant's 7% cut is

enacted contemporaneously when banding expires for its clients on December 31, 2019, Plaintiff Smith's Community Residential Setting may have to close.

47.    Plaintiff Cara Pedrille is a person with disabilities who began receiving home and community based waiver services in a Community Residential Setting prior to January 1, 2014.  She currently receives unbanded waiver services from Hammer, a member of ARRM.

48.    Plaintiff Pedrille's father, Nino Pedrille, is her guardian.

49.    Because Plaintiff Pedrille's services from Hammer are unbanded, she will experience a payment rate cut on July 1, 2018. Defendant's 7% cut is estimated to create an annualized reduction of approximately $6,500.

50.    Plaintiff Pedrille also receives DT&H services from Partnership Resources, Inc. ("PRI"), a member of MOHR.  Some of her DT&H services will transfer to new employment services on or about December 1, 2018.  Those new services will be unbanded, and Defendant will impose her 7% cut at that time.

## DEFENDANT JOHNSON PIPER, DHS,
## AND THE TIMING OF THE 7% CUTS TO DWRS RATES

51.    Defendant Johnson Piper is the Commissioner of DHS, and is named in her official capacity.  Defendant oversees DHS, which is the single Minnesota state agency responsible for licensing, certifying and enrolling ARRM members who provide residential and support services to persons with disabilities.

52.    Defendant is obligated to follow state law when computing and approving waiver service payment rates assigned to Plaintiffs under DWRS.

9

## DWRS and its RATE STABILIZATION
## SYSTEM KNOWN AS BANDING GOVERNS
## THE TIMING OF DEFENDANT'S CUTS

53.    From time to time, the Minnesota Legislature has enacted, and the Governor has signed into law, funding methodologies, systems and amendments thereto for various types of approved waiver services.  DWRS is one such system.

54.    DWRS was enacted at Minn. Stat. 256B.4914, and had an effective date of January 1, 2014.

55.    Before DWRS, Minnesota's former rate-setting system required county lead agencies and providers to negotiate provider payment rates.  Recommended rates and services were then submitted to DHS.  DHS would then issue Service Agreements itemizing the approved services, the number of units authorized, and the payment rates for each of those services.

56.    Unlike the former negotiating system, DWRS enacted a mathematical framework that uses component values specific to each individual to establish provider payment rates.

57.    The Declarations of Barb Turner and Lynn Noren, offered in support of temporary and preliminary injunctive relief, describe in greater detail how rate-setting is governed under DWRS.

58.    Defendant is using a Rate Stabilization mechanism enacted as part of DWRS to determine whether she will impose her unlawful 7% cuts on July 1, 2018, or December 31, 2019, or sometime in between those dates.

59.     That Rate Stabilization mechanism is known as "banding" and is enacted at Minn. Stat. § 256B.4913.

60.     If the waiver services used by Plaintiffs and members of the putative Plaintiff Class are banded, Defendant's 7% cut will take place on December 31, 2019.

61.     If the waiver services used by Plaintiffs and members of the putative Plaintiff Class are unbanded, Defendant's 7% cut will take place on July 1, 2018.

62.     Members of the putative Plaintiff Class can, and do, experience changes that cause some or all of their waiver services to change from banded to unbanded.

63.     This change may occur if and when a waiver service recipient switches to a different waiver service, such as dropping a DT&H center in favor of a community employment waiver service.

64.     If a person whose waiver services were previously banded makes such a change, Defendant's 7% cut will be accelerated from December 31, 2019 to the date of the Service Agreements reflecting the new services.

**JURISDICTION**

65.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and has original jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3) and (4).

66.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391(b) because the conduct alleged is occurring in this District.

67.     ARRM, MOHR and the Representative Plaintiffs bring this action under 42 U.S.C. §1983 to enforce and protect Plaintiffs' property rights, and those of the putative

Plaintiff Class, from Defendant's infringement. Defendant is attempting to cut 7% of Plaintiffs' property interests unlawfully, in violation of the Due Process Clause of the United States Constitution, as well as the ADA and Section 504 of the Rehabilitation Act.

## BACKGROUND FACTS

### (a)  Medicaid waiver programs are administered by States

68.     Pursuant to §1115 of the Social Security Act, a single state agency that administers a state's Medicaid program may apply to the Centers for Medicare and Medicaid Services ("CMS") to establish home and community based waiver services.

69.     Home and community based waiver services are designed to enhance the ability of persons with disabilities to live integrated in the community, instead of being isolated and segregated in institutional settings.

70.     Although §1115 waivers are jointly funded by the state and federal governments, they are administered by the states.

71.     The funding of Plaintiffs' waiver service payment rates for §1115 waiver services are primarily governed by Minn. Stat. ch. 256B and by the respective laws enacted by the Legislature to fund or amend appropriations for these waiver services.

**(b) The Legislature conferred three funding increases on all waiver recipients.**

72.     To meet certain unanticipated needs facing Plaintiffs, beginning five years ago the Legislature began enacting three separate funding increases for payment rates conferred on all Minnesota waiver recipients, without regard for what waiver services they were receiving or whether their payment rates were set by DWRS, or not.

73.   *The 2013 1% Increase:*  In 2013, the 88th Legislature enacted, and the Governor signed into law House File 1233 which provided a 1% increase to all home and community based waiver funding relied on by the Plaintiffs. *See,* 2013 Minn. Laws, Ch. 108, Art. 7, § 60. (hereinafter separately referred to as the "2013 1% Increase").

74.   In 2018, the 90th Legislature passed, but Governor Mark Dayton vetoed, Senate File 3656. Senate File 3656 purported to repeal by amendment the "reimbursement rates effective April 1, 2014, and any rate modification enacted during the 2014 legislative session…," thereby repealing the 2013 1% increase.  Senate File 3656 also would have replaced the 2013 1% Increase with a new and different appropriation.

75.   The 2013 1% Increase currently remains in full force and effect under 2013 Minn. Laws, Ch. 108, Art. 7, § 60.  As enacted, it confers on Plaintiffs specific and enforceable property rights in a precise level of funding for setting waiver service rates.

76.   When Governor Mark Dayton vetoed the Omnibus Bill on May 23, 2018, the Legislature's repeal by amendment of the 2013 1% Increase became null and void.

77.   *The 2014 5% Increase:*  In 2014, the Legislature enacted 2014 Minn. Laws, Ch. 312, Art. 27, § 75.  This 2014 amendment provided a 5% increase to home and community based waiver funding for Plaintiffs (hereinafter separately referred to as the "2014 5% Increase").

78.   In 2018, the 90th Legislature passed, but Governor Mark Dayton vetoed, Senate File 3656.  Senate File 3656 purported to repeal by amendment "reimbursement rates effective April 1, 2014, and any rate modification enacted during the 2014

legislative session…," thereby repealing the 2014 5% Increase.  Senate File 3656 also would have replaced the 2014 5% Increase with a new and different appropriation.

79.    When Governor Mark Dayton vetoed the Senate File 3656 on May 23, 2018, the Legislature's repeal by amendment of the 2014 5% Increase became null and void.

80.    The 2014 5% Increase currently remains in full force and effect under 2014 Minn. Laws, Ch. 312, Art. 27, § 75. As enacted, it confers on Plaintiffs specific and enforceable property rights in a precise level of funding for setting waiver service rates.

81.    _The 2015 1% Increase_:  In 2013, the Legislature enacted 2013 Minn. Laws, Ch. 108 Art. 7, § 34, which provides an additional 1% quality increase to home and community based waiver funding for the putative Plaintiff Class, and their providers represented by ARRM and MOHR. (hereinafter separately referred to as the 2015 1% Increase). Unlike the other two amendments, this 2015 1% increase was not immediate. Although enacted in 2013 it did not take effect until July 1, 2015.

82.    In 2018, the 90th Legislature passed, but Governor Mark Dayton vetoed, Senate File 3656. Senate File 3656 purported to repeal by amendment "reimbursement rates effective April 1, 2014, and any rate modification enacted during the 2014 legislative session…," thereby repealing the 2015 1% Increase.  Senate File 3656 also would have replaced the 2015 1% Increase with a new and different appropriation.

83.    When Governor Mark Dayton vetoed the Omnibus Bill on May 23, 2018, the attempted repeal by amendment of the 2015 1% Increase became null and void.

84.     The 2015 1% Increase currently remains in full force and effect under 2013 Minn. Laws, Ch. 108 Art. 7, § 34.  As enacted, it confers on Plaintiffs specific and enforceable property rights in a precise level of funding for setting waiver service rates.

85.     For the purposes of this Verified Complaint, the 2013 1% Increase, the 2014 5% Increase and the 2015 1% Increase shall hereinafter be jointly referred to as the "7% Amendments."

86.     The 7% Amendments were not time-limited and do not sunset.

87.     The Session Laws establishing the 7% Amendments confer protectible property rights in the Representative Plaintiffs and the putative Plaintiff Class, including their continued right to provider payment rates that maintain the funding increases authorized by law.

88.     Immediately upon their effective dates for each respective increase, DHS began increasing Plaintiffs' waiver service payment rates as mandated by the Legislature's 7% Amendments.

89.     For years, Plaintiffs have received, and have relied on; the additional waiver funding that resulted from the 7% Amendments.

90.     The 7% Amendments required Defendant's agents at DHS to add to each waiver recipient's DWRS payment rate an increase.

91.     Defendant's deprivation of Plaintiffs' property rights is taken under color of state law.

92.     Unlike other provisions of state law, when enacting the 7% Amendments, the Legislature did not condition their three effective dates on securing approval from CMS.

93.     When the Minnesota Legislature intends to condition a waiver or Medicaid statutory amendment on CMS federal approval, it does so expressly.

94.     For example, when changing employment services available to persons with disabilities, the Legislature's effective date provided: "The amendments to paragraph (c), clauses (5) to (7), are effective upon federal approval.  The commissioner of human services shall notify the revisor of statutes when federal approval is obtained." *See,* 2017 Laws, First Special Session, Chap. 6, Art. 1, § 20.

95.     None of the Session Laws underlying the 7% Amendments were conditioned upon federal approval, as demonstrated by the fact that Defendant started increasing Plaintiffs' DWRS rates as each of the three increases became effective.

96.     Defendant lacks authority to rescind, repeal or ignore any duly-enacted state Session Law or amendment that confers recognizable property rights on Plaintiffs, or on the members of the putative Plaintiff class.

### (c)  Minnesota's waiver funding must conform to its Olmstead Plan.

97.     The United States Supreme Court held in *Olmstead v. L.C.,* 527 U.S. 581, 597 (1999) that Title II of the ADA prohibits the unjustified segregation of individuals with disabilities, and requires states to provide services in the most integrated community setting available.

16

98.    To implement the requirements of *Olmstead,* Defendant, her agents at DHS, and a group known as the Minnesota *Olmstead* Subcabinet developed Minnesota's *Olmstead* Plan, which is a broad series of key activities Defendant must accomplish to ensure that people with disabilities are living, learning, working, and enjoying life in the most integrated community setting available.

99.    As a result of this Court's ongoing jurisdiction to monitor the federal Class Action Settlement approved in *Jensen, et al v. METO,* Defendant and her predecessor Commissioner agreed to submit DHS's *Olmstead* Plan and any amendments thereto, to this Court for review and approval.

100.    When enacting waiver funding, the Legislature must appropriate sufficient funds to implement Defendant's commitments under the *Olmstead* Plan, as initially approved by this Court in 2015, and subsequently reviewed or approved thereafter, upon amendment.

101.    This Court first approved the *Olmstead* Plan when Defendant was honoring the funding levels set by the 7% Amendments.

102.    Upon information and belief, Defendant's March 2018 revision to the *Olmstead* Plan has been submitted to this Court for review and approval.  That approval is pending.

103.    In a March 26, 2018 letter from the Olmstead Subcabinet, the Chair reported its efforts were brought about in part by "state agencies that have reformed processes, *adjusted funding priorities*, and reallocated staffing resources" (emphasis added).

104.    The *Olmstead* Plan identifies "Funding" of waivers as one of several "measurable goals." at *Olmstead* Plan at 21.

105.    Similarly, the *Olmstead* Subcabinet states that "Timeliness of Wavier Funding" is a "Topic Area" designed to increase the movement of people to more integrated settings. *See Olmstead* Plan at 20.

106.    At Page 63, the *Olmstead* Plan describes the need for timely funding of waivers so that "funding for waiver services moves at a reasonable pace according to urgency of need…"

107.    At Page 51, the *Olmstead* Plan describes the need to change "prevailing attitudes, expectations, and beliefs about the integration of people with disabilities into the competitive workplace…" instead of solely experiencing "center-based employment…"

108.    Nowhere does the *Olmstead* Plan authorize or empower the Defendant to launch a 7% sudden cut to the waiver funding mandated by the Legislature at the time the *Olmstead* Plan was approved.

109.    Upon information and belief, Defendant announced her 7% cuts contrary to the funding enacted by the Minnesota Legislature, and did so without benefit of law.

110.    Upon information and belief, Defendant announced her 7% cuts without evaluating, considering or deliberating what impact a $36,857,000 reduction in waiver funding for fiscal year 2019 would have to the goals, representations and commitments made in the *Olmstead* Plan.

111.    Upon information and belief, Defendant announced her 7% cuts without first amending the *Olmstead* Plan and without first securing Court approval regarding the impact those cuts will have on the goals, representations and commitments made in the *Olmstead* Plan.

112.    The Defendant and DHS must abide by the funding statutes enacted into state law when and if those statutes confer on Plaintiffs a specific property right to fund waiver services at prescribed levels.  Defendant has failed to meet this responsibility by cutting waiver service provider rates below the amounts authorized by law.

113.    Upon information and belief, the Legislature debates, approves and appropriates an authorized level of waiver funding after being apprized by Defendant's agents regarding DHS's obligations under the *Olmstead* Plan, and after considering other relevant factors such as the current workforce crisis facing the members of ARRM and MOHR.

114.    By cutting authorized funding by 7%, Defendant is ignoring and impairing property rights conferred by state funding laws on Plaintiffs, and other similarly situated persons with disabilities and their waiver service providers.

**(d)  The Defendant implements waiver budgets through Service Agreements.**

115.    Defendant is responsible for implementing each recipient's waiver service payment rates by issuing Service Agreements.

116.    Typically, Defendant's agents at DHS issue Service Agreements annually, unless changes in a waiver recipient's circumstance trigger an earlier need for a new Service Agreement.

117.    Such a change may include switching from one waiver service, such as receiving day services at a DT&H center to taking advantage of newer services designed to find and coordinate employment in the community.

118.    Members of ARRM and MOHR cannot invoice DHS for waiver services provided to the Representative Plaintiffs, or to members of the putative Plaintiff Class, unless the services, rates and units of service billed to DHS match the authorizations found in the Service Agreements.

119.    Defendant and her agents at DHS honored the 7% Amendments by increasing the payment rates approved in Plaintiffs' Service Agreements, until the expected cut on July 1, 2018.

**(e) CMS's criticism to the form of the 7% Amendments is not a repeal of state law.**

120.    CMS is a federal agency within the Executive Branch of the U.S. Government.  Although CMS holds oversight authority over the Medicaid State Plans adopted by each state, including Minnesota's § 1115 waiver programs, CMS has no lawful authority to repeal or otherwise render invalid a duly-enacted Minnesota state Session Law.

121.    When Governor Dayton vetoed Senate File 3656, which would have effectively repealed the 7% Amendments, the three Session Laws underlying the 7% Amendments remained in full force and effect.

122.    As such, DHS, under the direction of the Defendant Commissioner, remains obligated to fund waiver recipients and their providers at the levels mandated by current law.

123.    Unless enjoined, the Defendant intends to proceed as if the 2018 Legislature repealed the 7% Amendments, without replacing their funding, and will do so administratively by reducing DWRS payment rates in Service Agreements, contrary to the levels required by law.

124.    Although Senate File 3656 contemplated a different substitute appropriation at a level less than the 7% Amendments, that substitute appropriation was vetoed by Governor Dayton, along with the amendment that would have effectively repealed the three Session Laws.

125.    Unlike the vetoed Senate File 3656, Defendant cannot administratively substitute a different funding appropriation to compensate for or otherwise mitigate the substantial losses caused by the 7% cuts scheduled for July 1, 2018 and thereafter.

126.    Defendant's anticipated cuts will substantially reduce funding far below the Legislature's vetoed Senate File 3656, because Defendant plans to cut the entire funding for waiver payment rates mandated by the 7% Amendments.

127.    Unless enjoined, Defendant will issue new Service Agreements, effective beginning July 1, 2018, that will immediately reduce approximately 27% of Minnesota's DWRS waiver funding.

128.    While the exact number of members of the putative Plaintiff Class that will be affected by the first July 1, 2018 cuts is known only to Defendant and her agents at DHS, upon information and belief it will impact thousands of waiver recipients.

129.    Upon information and belief, in order to implement the revised July 1, 2018 Service Agreements, DHS announced that from June 8, 2018 until June 15, 2018, no

routine changes to Service Agreements will be made by its Medicaid Management Information System, known as MMIS.  Defendant's efforts to implement cuts immediately will; therefore; also result in the delay of other routine prior authorization approvals, unrelated to the implementation of Defendant's unlawful 7% cut.

130.    The Defendant bases her refusal to follow duly-enacted state law on the grounds that CMS officials told DHS in February, 2018 that CMS reviewed, and rejected, the form of the 7% Amendments.

131.    CMS's criticism comes three to five years after the Minnesota Legislature increased funding to Plaintiffs by way of the 7% Amendments.

132.    CMS erroneously criticized the 7% Amendments because Defendant's agents at DHS failed to explain the purpose and intent underlying the 7% Amendments adequately, and because DHS has yet to pursue all administrative appeal remedies or informal options available to convince CMS that its criticism is unfounded.

133.    DHS's erroneous submission caused CMS to conclude, mistakenly, that the 7% Amendments were akin to the 8.2% inflationary adjustment that was already enacted, approved and on deck for the DWRS framework.

134.    That DWRS inflationary adjustment yielded an approximate 8.2% increase for those waiver recipients whose waiver funding budgets are set under the DWRS framework.

135.    Upon information and belief, CMS grounded its rejection of the 7% Amendments on the assertion that Minnesota cannot "stack" multiple increases on a single DWRS framework.

136.    Defendant and her agents at DHS failed to explain that the 7% Amendments serve a different and distinct purpose from the standard 8.2% inflationary adjustment.

137.    When enacted, the DWRS framework included a mechanism to adjust, automatically, DWRS rates every five years so the system would remain on par with inflation.  This first adjustment occurred on July 1, 2017, and yielded about an 8.2% overall DWRS system inflationary adjustment.

138.    Contrary to the presumption of CMS and contrary to the explanation provided CMS by DHS, the 7% Amendments were not enacted to provide three more inflationary adjustments.

139.    Unlike inflationary adjustments that are triggered by the mere passage of the time, the 7% Amendments were enacted to fund *Olmstead* Plan initiatives and to help ARRM and MOHR members attract and retain employees during a historic workforce crisis.

140.    Unlike DWRS inflationary adjustments, the Legislature extended the 7% Amendments to Medicaid services used by persons with disabilities, including increasing the payment rates for Intermediate Care Facilities for Persons with Developmental Disabilities.  ("ICFs/DD")

141.    Extending the 7% Amendments to non-DWRS waiver services demonstrates that the Legislature was addressing the broader workforce and *Olmstead* issues facing all Minnesota providers, and was not just implementing additional DWRS inflationary increases.

142.    Upon information and belief, Defendant is not cutting those other, non-DWRS services by 7%.

143.    With respect to the 2015 1% Increase, and with respect to part of the 2014 5% Increase, service providers had to commit to quality improvement plans in order to retain those increases, further demonstrating those increases were not merely designed to address several years of inflation.

144.    Defendant and her agents at DHS failed to recognize that CMS's directive criticizing or rejecting the 7% Amendments was not self-implementing.

145.    Had Defendant opted to implement CMS's rejection properly, Defendant would have sought and secured from the state Legislature and Governor repeals of the 7% Amendments.  She did not.

146.    Because DHS did not attain a legislative repeal of the 7% Amendments, those funding levels remain on the books as valid, enforceable laws that confer property rights specific to each individual waiver recipient and their waiver service provider.

147.    When considering whether to enact the 7% Amendments, the Legislature was aware that consistent with the *Olmstead* Plan, DT&H providers would be required to restructure their DT&H services to provide more employment opportunities out in their communities, instead of solely offering services exclusively at DT&H locations.

148.    When considering whether to enact the 7% Amendments, the Legislature was aware that the members of ARRM are striving to provide more individualized housing options for their clients with disabilities, instead of serving them in typical, four-person residential Community Residential Settings.

24

149. The Legislature enacted the 2013 1% Increase, the 2014 5% Increase and the 2015 1% Increase in order to address the workforce crisis and to provide Defendant with sufficient funding to accomplish the goals and commitments set by the approved *Olmstead* Plan.

150. If this Court does not enjoin Defendant from eradicating the 7% Amendments, the resulting funding cuts will directly impact the ability of ARRM and MOHR's members to serve the putative Plaintiff Class, and to improve their lives as contemplated by the *Olmstead* Plan.

151. Upon information and belief, CMS told DHS in February 2018 that it objected to the form of the 7% Amendments.

152. Upon information and belief, CMS may have begun withholding its federal financial share of the 7% Amendments around February 2018.

153. Regardless whether CMS stopped federal funding or not, Defendant continued to honor fully funding the 7% Amendments from February 2018 until the upcoming first 7% cut on July 1, 2018.

154. Upon information and belief, Defendant did so because she mistakenly presumed that the Legislature would enact, and the Governor would sign into law, a corrective substitute fix that modified the 7% Amendments in a manner acceptable to CMS.

155. In light of the May 23, 2018 veto, rather than resurrect discussions with CMS, the Defendant now plans to *throw in the towel* regarding CMS's criticisms, and simply implement the 7% cuts.

156.    According to the Kaiser Foundation, for 2016 Minnesota's Medicaid program was funded 57.4% by the federal government, and 42.6% by the state.

157.    Regardless whether CMS elects to fund its share of the 7% Amendments or not, under the doctrine of Federalism, CMS lacks any authority to repeal a state Session Law.

158.    CMS's notification to DHS does not constitute a repeal of state law, and does nothing to eradicate the property rights conferred on Plaintiffs by the 7% Amendments.

159.    Nor does CMS's rejection relieve Defendant from her statutory mandate to implement the 7% Amendments, as enacted.

160.    Although Defendant and her agents at DHS may be concerned that honoring the current 7 % Amendments will force DHS to overspend its state Medical Assistance program allocations, that concern fails to consider two significant facts.

161.    First, when the 7% Amendments were enacted, the state Legislature appropriated sufficient state funds to cover the state's share for each of the resulting increases.   Those appropriations for the 7% Amendments will continue until such time that the 7% Amendments are repealed or amended.

162.    Second, pursuant to 42 CFR § 431.250,  if this Court issues a Temporary Restraining Order or Order of Preliminary Injunction enjoining the anticipated cuts and ordering Defendant to pay for Medicaid waiver services at the level required by the 7% Amendments, CMS will be required to fund its federal share, regardless of CMS's misgivings about the form of the 7% Amendments.

163.    That regulation, 42 CFR § 431.250, provides that federal financial participation is "available" when services are "made under a court order."

**(f)   Defendant's 7% cuts inject volatility and instability into DWRS.**

164.    By phasing in DWRS over several years, banding prevents the volatility that would otherwise be detrimental to either the provider and recipient.

165.    Had all waiver recipients and their providers been compelled to convert to the DWRS payment system immediately upon DWRS enactment on January 1, 2014, some would have faced debilitating funding cuts.

166.    Because their services began after the enactment date for DWRS, unbanded recipients had their payment rates set initially by the DWRS framework.  As such there was no need to soften the financial transition from the former payment system to DWRS.

167.    Aside from the 7% cuts, while many recipients and their providers will sustain material decreases in their payment rates when banding is lifted on December 31, 2019, others will experience rate increases.

168.    Upon information and belief, when banding eventually ends, the State of Minnesota will likely be obligated to increase overall waiver funding by about 15%, in order to convert all members of the putative Plaintiff Class and their providers to the DWRS framework in December 2019.

169.    Despite this potential overall increase, those Plaintiffs who experience funding decreases whenever their banding is lifted, that impact will be materially aggravated by Defendant's unauthorized additional 7% cut to funding.

170.   Unlike banded services, state DWRS law provides no mechanism preventing Defendant from imposing sudden, volatile payment rate adjustments to unbanded services already governed by DWRS, because unexpected decreases like Defendant's 7% cut were never contemplated or authorized by the Legislature.

171.   As such, unless this Court enjoins Defendant's July 1, 2018 7% cut, all unbanded waiver services will face the full impact and brunt of a sudden 7% decrease to their payment rates, despite the fact that the state laws appropriating this exact same 7% remain in full force and effect.

**(g)   Defendant failed to exhaust all appeals with CMS, to the detriment of Plaintiff's property rights.**

172.   Defendant and her agents at DHS owe a duty to Plaintiffs to administer the Minnesota Medical Assistance program, including all waiver programs, in a manner that is uniform and consistent with state and federal laws.

173.   Defendant failed to meet that duty when her agents at DHS supplied erroneous and unpersuasive information to CMS regarding the Legislative purpose and intent behind the 2013 1% Increase, the 2014 5% Increase and the 1% 2016 Increase.

174.   Upon information and belief, CMS affords DHS and the State of Minnesota the opportunity to pursue administrative appeals of any final CMS action that may prejudice the Minnesota Medicaid program, including but not limited to rejections of any § 1115 waiver.

28

175.   Upon information and belief, CMS also allows a State to contest decisions regarding the federal share.  The state may pursue an independent challenge to CMS's final decision through the HHS Departmental Appeals Board Appellate Division.

176.   Upon information and belief, in addition to failing to pursue formal administrative appeal remedies with CMS, Defendant's agents at DHS simply stopped informal discussions that might change CMS's attitude about the 7% Amendments.

177.   Not exhausting appeals or discussions with CMS may have been the result of Defendant's hubris that a Legislative fix remedying CMS's objections would be easily attained.

178.   Plaintiffs do not enjoy the same right to appeal CMS' criticism of the 7% Amendments. They must rely on Defendant to advance any challenge.

179.   Upon information and belief, Defendant is implementing her July 1, 2018 cut before exhausting all administrative remedies afforded by CMS.

180.   Enjoining the 7% cuts will provide Defendant with the time and opportunity necessary to pursue all formal appeals at CMS to explain why the 7% Amendments are materially different from the standard 8.2% inflationary factor that took effect on July 1, 2017.

## CLASS ACTION ALLEGATIONS

181.   Plaintiffs Karla Dee Marder, Robert Clapper, Kathryn Smith and Cara Pedrille (referred to jointly as "Representative Plaintiffs"), by and through their respective guardians, bring this class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the Due Process Clause of the United States

Constitution, as enforceable under 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 and 12131 *et seq* and implementing regulations; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and implementing regulations.

182.    The Representative Plaintiffs bring this action on behalf of themselves and other individuals who are receiving waiver services, whether from ARRM or MOHR members or other providers, and whose funding budgets and resulting payment rates will be cut by 7%, unless Defendant's actions are enjoined by this Court.

183.    The Representative Plaintiffs share common issues of fact and law with the putative Plaintiff Class, in that all members of the class are currently receiving home and community based waiver services and are targeted to have their waiver budgets, and resulting payment rates for their licensed providers cut by 7% on either July 1, 2018 or December 31, 2019, or as their Service Agreements come up for earlier renewal or adjustment.

184.    The members of the putative Plaintiff Class are so numerous that joinder of all members is impracticable.

185.    The putative Plaintiff Class is ascertainable, as all potential Class Members can be identified in Defendant's current records of Medical Assistance and Disability Waiver recipients.

**COUNT I: Deprivation of Property Without Due Process or Just Compensation.**

186.    Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

187.    Defendant's anticipated cuts violate the U.S. Constitution.

188.    Plaintiffs may enforce statutorily-conferred property rights pursuant to 42 U.S.C. § 1983.

189.    The 2013 1% Increase, the 2014 5% Increase and the 1% 2016 Increase create and confer enforceable property rights to a specific level of waiver funding for Plaintiffs' payment rates for waiver services.

190.    As long as the Representative Plaintiffs and the members of the putative Plaintiff Class remain eligible for waiver services, they have a legitimate claim of entitlement to the appropriated funds and rates yielded from the 7% Amendments.

191.    The rate increases conferred by the 7% Amendments are individual and personal to the Representative Plaintiffs and members of the putative Plaintiff Class, because they are computed based on the individual characteristics and needs of each person served, including what type of waiver service they require, how often they need those services, and the payment rates approved in their Service Agreements.

192.    State law recognizes that the Representative Plaintiffs and the putative Plaintiff Class have property rights in disability benefits, including waiver funding.

193.     For example, Defendant is barred by state law from reducing disability wavier benefits unless she first affords the waiver recipient a right to a hearing under Minn. Stat. §256.045, subd. 3 (*"any person …whose assistance is … reduced…or claimed to have been incorrectly paid"* is entitled to a hearing).

194.    State law also recognizes that the members of ARRM and MOHR have property rights in payment rates that have already been imposed by law, and paid by Defendant.

195.    For example, under Minn. Stat. § 256B.50, subd. 1a(b), providers have the right to contest any prospective or retroactive reduction taken by Defendant's agents to their payment rates.

196.    Despite the state statutory due process requirements available to waiver recipients and providers, Defendant intends to modify Service Agreements and reduce assistance by 7% without first affording any due process hearing.

197.    As the head of DHS, a state agency whose jurisdiction is defined by its enabling legislation and by the Minnesota Administrative Procedure Act, Defendant is not authorized to repeal the existing state Session Laws that establish the 7% Amendments.

198.    Nor is any agent of Defendant at DHS authorized to relinquish millions of dollars of waiver funding by notifying CMS that the State of Minnesota will give up the legislatively-mandated increases established by the 7% Amendments.

199.    Unless enjoined, Defendant and her agents at DHS will deprive and impair the property rights established and conferred by the 7% Amendments.

200.    Under the Fourteenth Amendment to the Constitution of the United States, Defendant's anticipated cuts will deprive the Plaintiffs of their conferred property rights without due process of law or just compensation.

201.    The cuts will have a direct, negative impact not only on the waiver funding available to Plaintiffs, but will also impact the services that members of ARRM and MOHR will be able to provide to waiver recipients.

202.    Defendant's immediate July 1, 2018 cuts are arbitrary and capricious and shock the conscience by cutting all unbanded waiver services suddenly and immediately, while banded services are delayed.

203.    At least those using and providing banded waiver services have the hope that an intervening legislative session might enact a correction before their 7% cuts take effect on December 31, 2019.

204.    Those using and providing unbanded services have no such hope because Defendant is commencing those 7% cuts on July 1, 2018.

205.    It also shocks the conscience that Defendant's agents would deprive Plaintiffs of their property, before exhausting all administrative remedies or opportunities to resolve CMS's criticisms regarding the form of the 7% Amendments.

**COUNT II: Violations of Title II of the Americans with Disabilities Act.**

206.    Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

207.    The Representative Plaintiffs and the members of the putative Plaintiff Class are individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 1213(2).  They are substantially limited in one or more major life activities such as learning, working and brain function.

208.    Defendant, acting in her official capacity, administers the operation of DHS.  DHS is a public entity within the meaning of the ADA.

209.    As an obligation under their licensing and enrollment requirements, Defendant mandates that the members of ARRM and MOHR must administer services to the Representative Parties and to the members of the putative Plaintiff Class in a manner that allows all waiver recipients to live in the most integrated setting appropriate to their needs.

210.    As such, the members of ARRM and MOHR hold an indirect right under the ADA that obligates the Defendant to administer the waiver system in a fair and uniform manner that will not frustrate their ability and obligation to provide supports and services in the least intrusive setting.

211.    By supporting this claim under the ADA, the members of ARRM and MOHR are analogous to a school district joining a federal action brought by students to enjoin state laws or actions that prevent students from receiving services that comport with constitutional principles.

212.    Upon information and belief, the Legislature determined that Defendant and her agents at DHS might better accommodate Plaintiffs' rights and responsibilities under the ADA if the Legislature increased waiver funding by enacting the 7% Amendments.

213.    Defendant's actions, if not enjoined, will cause the members of ARRM and MOHR, and the Representative Plaintiffs and the putative Plaintiff Class, to sustain injuries that include, but are not limited to, rolling back funding for initiatives required by

the ADA and the *Olmstead* Plan that were paid for, in part, by the appropriations enacted under the 7% Amendments.

214.    Plaintiffs are entitled to injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violations of Title II of the ADA, and its implementing regulations, caused by the Defendant's anticipated 7% funding cuts.

**COUNT III: Violation of Section 504 of the Rehabilitation Act.**

215.    The Plaintiffs re-allege the preceding paragraphs as though fully set further herein.

216.    The Representative Plaintiffs, and the members of the putative Plaintiff Class, are qualified individuals with disabilities under Section 504 of the Rehabilitation Act.

217.    Defendant and her agents at DHS receive federal financial assistance for their §1115 waiver services programs and activities.

218.    Upon information and belief, the Legislature determined that Defendant and her agents at DHS might better accommodate Plaintiffs' rights and responsibilities under Section 504 of the Rehabilitation Act if the Legislature increased waiver funding by enacting the 7% Amendments.

219.    Defendant's actions, if not enjoined, will cause the members of ARRM and MOHR, the Representative Plaintiffs and the putative Plaintiff Class to sustain injuries that include, but are not limited to, rolling back funding for initiatives required by the *Olmstead* Plan and Section 504 of the Rehabilitation Act that were paid for in part by the increases enacted by the 7% Amendments.

220.    By supporting this claim under Section 504 of the Rehabilitation Act,  the members of ARRM and MOHR's are analogous to a school district joining a federal action brought by students to sue a state to enjoin laws or actions that prevent students from receiving services that comport with constitutional principles.

221.    Plaintiffs are entitled to injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violation of Section 504 of the Rehabilitation Act, and its implementing regulations, caused by Defendant's anticipated funding cut.

## PRAYER FOR RELIEF

**FOR ITS PRAYER FOR RELIEF, PLAINTIFFS RESPECTFULLY REQUEST THAT THIS COURT:**

1.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23.

2.    Issue a Declaratory Judgment that Defendant Commissioner Emily Johnson-Piper lacks authority to repeal or otherwise circumvent:

(i)   2013 Minn. Laws, Ch. 108, Art. 7, § 60;

(ii)  2014 Minn. Laws, Ch. 312, Art. 27, § 75; and

(iii) 2013 Minn. Laws, Ch. 108 Art. 7, § 34.

3.    Issue a Declaratory Judgment that Defendant Commissioner Emily Johnson-Piper must abide by and continue to set Plaintiffs' waiver budgets and related payment rates in accordance with the terms of :

(i)   2013 Minn. Laws, Ch. 108, Art. 7, § 60;

(ii)  2014 Minn. Laws, Ch. 312, Art. 27, § 75; and

(iii) 2013 Minn. Laws, Ch. 108 Art. 7, § 34;

until such time that such Session Laws are repealed or amended;

4.    Issue a Declaratory Judgment ruling that the Defendant's anticipated 7% cuts from Plaintiffs' waiver funding for payment rates would deprive Plaintiffs of protectible property rights without substantive or procedural Due Process of Law;

5.    Issue a Declaratory Judgment ruling that the Defendant's anticipated 7% cuts from Plaintiffs' waiver funding for payment rates would violate Title II of the ADA and Section 504 of the Rehabilitation Act by rolling back funding for initiatives under the approved *Olmstead* Plan;

6.    Issue a Temporary Restraining Order, Preliminary and Permanent Injunctions enjoining Defendant and her agents at DHS from taking any action that reverses, circumvents, ignores, violates, avoids or bypasses the funding and payment rate increases enacted by:

(a)  2013 Minn. Laws, Ch. 108, Art. 7, § 60;

(ii)  2014 Minn. Laws, Ch. 312, Art. 27, § 75; and

(iii) 2013 Minn. Laws, Ch. 108 Art. 7, § 34,

including but not limited to enjoining Defendant from issuing any Service Agreements that implement her announced 7% cuts to waiver service payment rates;

5.     Award Plaintiffs their reasonable attorneys' fees, costs and disbursements, as allowed by and consistent with applicable law; and

6.    Grant any other relief which is just and equitable to protect the rights of the members of ARRM and MOHR, Karla Dee Marder, Robert Clapper, Kathryn Smith, Cara Pedrille and the putative Plaintiff Class.

including but not limited to enjoining Defendant from issuing any Service Agreements

that implement her announced 7% cuts to waiver service payment rates;

5.  Award Plaintiffs their reasonable attorneys' fees, costs and disbursements,

as allowed by and consistent with applicable law; and

6.  Grant any other relief which is just and equitable to protect the rights of the

members of ARRM and MOHR, Karla Dee Marder, Robert Clapper, Kathryn Smith,

Cara Pedrille and the putative Plaintiff Class.

Dated: **6·11**, 2018

Samuel D. Orbovich (#0137017)
Pari I. McGarraugh (#0395524)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
sorbovich@fredlaw.com
*Attorneys for Plaintiffs*


## VERIFICATION


Barb Turner, states upon penalty of perjury that she is the Senior Director of External
Affairs for Plaintiff ARRM and that she has read the foregoing Complaint and believes
the contents thereof that pertain to Defendant's conduct and actions regarding the 7%
cuts, the Legislative history and the circumstances confronting ARRM's membership to
be true and correct based either on her own personal knowledge, information and belief
or on information gathered by ARRM staff and members.  She relies on counsel for the
Complaint's legal analysis.

Date: 6 - 11 - 18

Barb Turner
Barb Turner

## VERIFICATION

Lynn Noren, states upon penalty of perjury that she is the Co-Chair of MOHR's Government Affairs Committee and that she has read the foregoing Complaint and believes the contents thereof that pertain to Defendant's conduct and actions regarding the 7% cuts, the Legislative history and the circumstances confronting MOHR's membership to be true and correct based either on her own personal knowledge, information and belief or on information gathered by MOHR staff and members. She relies on counsel for the Complaint's legal analysis.

Date: 6/11/18

Lynn Noren

64073055.6