UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ARRM, a Minnesota non-profit association incorporated under the laws of Minnesota, on behalf of itself and its members; | Case No. 18-cv-1627 (WMW/BRT) |
| Minnesota Organization for Habilitation and Rehabilitation (MOHR), a Minnesota non-profit association incorporated under the laws of Minnesota, on behalf of itself and its members; and | |
| Karla Dee Marder, by her guardian Judy Marder; Robert Clapper, by his guardian James Clapper; Kathryn Smith, by her guardian Gerald Smith; and Cara Pedrille, by her guardian Nino Pedrille, on behalf of other waiver recipients similarly situated, | **ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| Emily Johnson Piper, in her Official Capacity as Commissioner of the Minnesota Department of Human Services, | |
| Defendant. | |

This matter is before the Court on Plaintiffs' motion for a temporary restraining order and preliminary injunction. (Dkt. 6.) Plaintiffs seek to enjoin Defendant Emily Johnson Piper, in her official capacity as Commissioner of the Minnesota Department of Human Services (DHS), from taking any action that reverses, circumvents, ignores, violates, avoids, or bypasses certain payment rate increases provided for under Minnesota law. For the reasons addressed below, the Court denies the motion.

**BACKGROUND**

This case involves anticipated funding reductions to Minnesota's "waiver services" payment rates.  Waiver services are services for which the federal government agrees, in limited circumstances, to waive certain statutory and regulatory requirements that ordinarily would govern Medicaid assistance funding.  *See* 42 C.F.R. §§ 430.25, 441.300. The state agency that administers a state's Medicaid program may apply to the Centers for Medicare and Medicaid Services (CMS) for authorization to establish home and community-based waiver services, which are designed to enhance the ability of persons with disabilities to live in the community rather than in an institutional setting.  Waiver services are administered by states but jointly funded by state and federal governments.

In Minnesota, DHS is the state agency responsible for licensing, certifying, and enrolling providers of waiver services.  Acting through the Commissioner, DHS also computes and approves waiver service payment rates according to Minnesota law.  The Minnesota Disability Waiver Rate System (DWRS) provides a mathematical framework for establishing provider payment rates for approved waiver services.  *See* Minn. Stat. § 256B.4914.  Enacted by the Minnesota Legislature, DWRS went into effect on January 1, 2014.  Pursuant to DWRS, waiver service payment rates adjust automatically every five years to account for inflation.  The first automatic inflationary adjustment occurred on July 1, 2017.

In addition to the DWRS automatic inflationary adjustments, the Minnesota Legislature separately enacted three session laws that increased waiver service payment rates, with effective dates in 2014 and 2015.  *See* 2014 Minn. Laws, Ch. 312, Art. 27, § 75;

2013 Minn. Laws, Ch. 108, Art. 7, §§ 34, 60.  These session laws, which cumulatively increased waiver service payment rates by 7%, affected all payment rates for Minnesota waiver service recipients without regard for the type of waiver services received or whether the payment rates had been set by DWRS.

During the 2018 legislative session, the Minnesota Legislature passed an omnibus bill that, as relevant here, would have repealed the cumulative 7% waiver service payment rate increase and replaced it with different appropriations.  However, Minnesota Governor Mark Dayton vetoed that omnibus bill in May 2018.  Consequently, the three session laws that provide for the 7% waiver service payment rate increases remain in effect.  Shortly thereafter, the Commissioner announced that DHS nonetheless intends to eliminate the 7% waiver service payment rate increase.  The elimination of this rate increase will occur in multiple stages, with the first funding reduction scheduled to occur on July 1, 2018, and the final funding reduction scheduled to occur December 31, 2019.

Plaintiffs ARRM and Minnesota Organization for Habilitation and Rehabilitation (MOHR) (collectively, "Organizational Plaintiffs") are nonprofit associations incorporated under Minnesota law.  ARRM advances Minnesota's home and community-based service programs that support people living with disabilities, and its members include more than 200 service providers, businesses, and stakeholders, including nonprofit and for-profit entities that are certified to provide such services.  MOHR is an association with more than 100 members that provide services to persons with disabilities.  Plaintiffs Karla Dee Marder, Robert Clapper, Kathryn Smith, and Cara Pedrille, through their respective guardians (collectively, "Individual Plaintiffs"), receive waiver services subject to DWRS.

Plaintiffs commenced this action to enjoin the Commissioner from implementing the anticipated 7% funding reduction to Minnesota's waiver service payment rates.

Plaintiffs now seek a temporary restraining order and preliminary injunction. The Commissioner opposes Plaintiffs' motion, arguing that the Individual Plaintiffs lack standing and that Plaintiffs have not established that they are entitled to preliminary injunctive relief.

## ANALYSIS

### I.    Standing

The Commissioner argues that the Individual Plaintiffs lack standing to seek injunctive relief because they have not alleged an imminent injury in fact. The Court addresses this issue first because questions of standing implicate the Court's subject-matter jurisdiction. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002).

The jurisdiction of federal courts extends only to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1; *accord Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). To satisfy the case-or-controversy requirement of Article III of the United States Constitution, a plaintiff must establish standing as an "indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *accord Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012). To meet this standing requirement, the plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship between the contested conduct and the alleged injury, and (3) show that a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560-61; *accord Hargis*, 674 F.3d at 790. Only the injury-in-fact requirement is at issue here.

4

To allege an "injury in fact" that confers standing to seek injunctive relief, a plaintiff must face a threat of ongoing or future harm. *Park v. Forest Serv. of the U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). An injury in fact "must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (internal quotation marks omitted). Allegations of a possible future injury are insufficient to confer standing. *Id.*

In *Clapper*, the Supreme Court of the United States held that the plaintiffs lacked standing because a "speculative chain of possibilities" could not establish an injury in fact based on potential future injuries. *Id.* at 414. The plaintiffs in *Clapper* sought a declaration that Section 702 of the Foreign Intelligence Surveillance Act of 1978 is unconstitutional and an injunction against surveillance authorized by that section. *Id.* at 401. The plaintiffs attempted to establish an injury in fact based on an objectively reasonable likelihood that their communications would be acquired pursuant to the challenged law at some point in the future. *Id.* In rejecting that argument, the Court observed that the plaintiffs' possible future injury depended on a "highly speculative fear" that a lengthy chain of events would occur:

> (1) the Government will decide to target the communications of non-U.S. persons with whom [plaintiffs] communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the

> Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

*Id.* at 410.

It is undisputed here that the Individual Plaintiffs' alleged injuries are exclusively *future* injuries because the Commissioner's anticipated funding reductions have not occurred. As such, to establish standing, the Individual Plaintiffs must demonstrate that their future injuries are "*certainly* impending" as opposed to mere "allegations of *possible* future injury." *Id.* at 409 (internal quotation marks omitted). Several factors demonstrate that the Individual Plaintiffs have not satisfied this burden.

As an initial matter, it is undisputed that the waiver services received by Plaintiffs Marder and Smith will not be affected by the Commissioner's anticipated funding reductions—if at all—until December 31, 2019. Because these possible future injuries will not occur for more than 18 months, they are not "imminent" as is required to establish Article III standing. Moreover, these injuries are highly speculative given that one or more events could occur in the next 18 months that might prevent these alleged injuries from ever arising—including, but not limited to, administrative, legislative, or judicial action. For these reasons, Plaintiffs Marder and Smith have not alleged an injury in fact as is necessary to establish Article III standing to obtain injunctive relief.

Plaintiffs Clapper and Pedrille have alleged that the Commissioner's anticipated funding reductions will affect the waiver services they receive beginning on October 1, 2018, and July 1, 2018, respectively. The timing of these alleged injuries is relatively sooner than the injuries alleged by Plaintiffs Marder and Smith. However, as in *Clapper*,

Plaintiffs Clapper and Pedrille allege possible future injuries that depend on a "speculative chain of possibilities" that may or may not occur. *Id.* at 414. First, the Commissioner's funding reductions would have to occur as anticipated, without any administrative or legislative intervention. Second, the providers of the waiver services received by Plaintiffs Clapper and Pedrille would have to choose to discontinue or otherwise limit waiver services rather than seeking alternative funding or seeking to account for the Commissioner's funding reductions in some other manner that would not materially affect waiver services. Third, those service providers would have to discontinue or otherwise limit the *particular* waiver services that Plaintiffs Clapper and Pedrille receive, as opposed to *other* waiver services.[1] Fourth, Plaintiffs Clapper and Pedrille would have to seek, *and be denied*, individualized waiver services payment rate increases by submitting "exception requests" as provided under DWRS. *See* Minn. Stat. § 256B.4914, subd. 14. Fifth, the entities that provide waiver services to Plaintiffs Clapper and Pedrille also would have to appeal—unsuccessfully—the Commissioner's waiver service payment rate determination.

The foregoing series of events that would have to occur for an injury to befall Plaintiffs Clapper and Pedrille requires an attenuated and speculative chain of inferences. "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court' " to establish standing based on a possible future injury.

---

[1] The Individual Plaintiffs do not directly receive the waiver service funds at issue here; rather, they receive waiver services from providers, and the providers of those waiver services receive the waiver service funds. Nothing in the record suggests that the providers of waiver services to Plaintiffs Clapper and Pedrille plan to discontinue or otherwise limit the particular waiver services that Plaintiffs Clapper and Pedrille receive as a result of the Commissioner's anticipated funding reductions.

*Clapper*, 568 U.S. at 414 n.5 (quoting *Lujan*, 504 U.S. at 562).  The chain of events described above depends, at least in part, on future choices made by independent actors not before this Court, including waiver service providers, administrative agencies, and the Minnesota Legislature.  As in *Clapper*, this "speculative chain of possibilities does not establish that injury based on potential future [occurrences] is certainly impending."  *Id.* at 414.

In summary, because the Individual Plaintiffs have not satisfied their burden to demonstrate that their future injuries are certainly impending, as opposed to mere allegations of possible future injuries, the Individual Plaintiffs lack Article III standing and this Court lacks subject-matter jurisdiction over the Individual Plaintiffs' claims for injunctive relief.  *See Faibisch*, 304 F.3d at 801 (stating that standing implicates the court's subject-matter jurisdiction); *see also* Fed. R. Civ. P. 12(h)(3) (providing that, if a court determines it lacks subject-matter jurisdiction over a claim, such claims must be dismissed).  Accordingly, the Individual Plaintiffs' claims are dismissed without prejudice for lack of subject-matter jurisdiction to the extent that the claims seek injunctive relief against the Commissioner.

## II.    Injunctive Relief as to the Organizational Plaintiffs

When determining whether a temporary restraining order or preliminary injunction is warranted, four factors are considered: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that the injunction will inflict on other parties, and (4) the public

interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).[2]  The

burden to establish that injunctive relief should be granted rests with the movant. *Watkins*

*Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).   A preliminary injunction "is an

extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 24 (2008).  Because the "failure to show irreparable harm is an independently

sufficient ground upon which to deny a preliminary injunction," *Novus Franchising, Inc.*

*v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (internal quotation marks omitted), the Court

begins its analysis with this *Dataphase* factor.

### A. Irreparable Harm

A party must establish the threat of irreparable harm to obtain preliminary injunctive

relief. *See Dataphase*, 640 F.2d at 114. "Irreparable harm occurs when a party has no

adequate remedy at law, typically because its injuries cannot be fully compensated through

an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th

Cir. 2009).  When an adequate remedy exists under state law, injunctive relief is not

appropriate. *See Pulliam v. Allen*, 466 U.S. 522, 542 & n.22 (1984); *Sterling v. Calvin*,

874 F.2d 571, 572 (8th Cir. 1989) (per curiam); *see also Aviles-Wynkoop v. Neal*, 978 F.

Supp. 2d 15, 22 (D.D.C. 2013) (concluding that, "in light of the extensive administrative

remedies available to plaintiff, the Court would be hard-pressed to conclude that it is *likely*

that plaintiff will face irreparable harm unless the Court issues the injunction").

---

[2]    The Organizational Plaintiffs seek both a temporary restraining order and a
preliminary injunction.  The same legal standard applies to both forms of relief. *See S.B.*
*McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).

The Organizational Plaintiffs argue that, if the Commissioner's anticipated funding reductions are not prospectively enjoined, they will suffer irreparable harm because the Eleventh Amendment to the United States Constitution prohibits retrospective monetary relief from state agencies based on sovereign immunity. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) (concluding that "[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"). The Commissioner counters that the Organizational Plaintiffs have an adequate remedy under state law—namely, a statutory appeal process through which providers of waiver services can dispute payment rate determinations.

"A provider may appeal from a determination of a payment rate established pursuant to this chapter . . . if the appeal, if successful, would result in a change to the provider's payment rate . . . ." Minn. Stat. § 256B.50, subd. 1. Subsequent subdivisions within Section 256B.50 describe the procedures for filing an appeal, the appeals review process, and how a prevailing party may recover attorneys' fees and costs. *Id.*, subds. 1b, 1c, 1e. The Organizational Plaintiffs do not dispute that this appeals process exists. To the contrary, they rely on the existence of this appeals process to support their motion for injunctive relief, asserting that these "statutory appeal rights demonstrate that the rates set by DHS and paid to providers by Defendant constitute protectible property rights."

The Organizational Plaintiffs contend, however, that the statutory appeals process would be futile because any appeal would be decided by the Commissioner, who intends

to implement the 7% funding reduction.[3]  But Section 256B.50 addresses this concern.  If a "provider disagrees with the appeal determination, the provider may file with the commissioner a written demand for a contested case hearing to determine the proper resolution of specified appeal items."  *Id.*, subd. 1c(c).  A contested case demand is referred to the Office of the Attorney General, and the contested case is heard by an administrative law judge.  *Id.*, subd. 1c(c), (d).  Minnesota law also provides for judicial review of contested cases.  *See* Minn. Stat. §§ 14.63-14.69.  Moreover, mandamus relief is available in Minnesota courts to compel a state governmental agency "to perform a duty [that] the law clearly and positively requires . . . where there is no other plain, speedy, and adequate remedy available."  *In re Welfare of S.L.J.*, 782 N.W.2d 549, 553, 557-58 (Minn. 2010).  For these reasons, the Organizational Plaintiffs' argument that they have no adequate or non-futile state-law remedy lacks merit.

The Organizational Plaintiffs rely in part on *St. Otto's Home v. Minnesota Department of Human Services*, 437 N.W.2d 35 (Minn. 1989), in support of their motion.  But *St. Otto's Home* belies the Organizational Plaintiffs argument that they lack an adequate state-law remedy.  The relators in *St. Otto's Home* were nursing homes that challenged a rate-setting determination by DHS.  437 N.W.2d at 36.  After the nursing homes administratively appealed DHS's decision, DHS initiated contested case

---

[3]    Although Plaintiffs advance additional arguments as to why the statutory appeals process is inadequate, those arguments are specific to exception requests and the subsequent appeal process available to individual waiver service recipients.  *See* Minn. Stat. §§ 256.045, 256B.4914, subd. 14.  In light of the conclusion in Part I of this Order that the Individual Plaintiffs lack standing, the Court need not address these arguments.

proceedings in which an administrative law judge ultimately recommended that DHS's determinations be upheld. *Id.* The nursing homes appealed to the Minnesota Court of Appeals, which affirmed. *Id.* The Minnesota Supreme Court reversed and remanded to the commissioner of DHS "for reimbursement" to the nursing homes, holding that the commissioner's interpretation of the governing rules was improper. *Id.* at 39-45. Both the procedural background and the disposition in *St. Otto's Home* suggest that the Organizational Plaintiffs have a state-law remedy.

Because the Organizational Plaintiffs have an adequate state-law remedy, they have not established irreparable harm such that injunctive relief is warranted.

### B. Remaining *Dataphase* Factors

The Organizational Plaintiffs' failure to show irreparable harm is, by itself, a sufficient basis to deny a preliminary injunction. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). In light of this determination, the Court declines to address the remaining *Dataphase* factors. *See, e.g.*, *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 935 (D. Minn. 2016) (denying temporary restraining order based solely on plaintiff's failure to demonstrate irreparable harm); *Jackson v. Macalester Coll.*, 169 F. Supp. 3d 918, 922 (D. Minn. 2016) (same).

### ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.    The claims asserted by Plaintiffs Karla Dee Marder, Robert Clapper, Kathryn Smith, and Cara Pedrille are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction to the extent that these plaintiffs seek injunctive relief; and

2.    Plaintiffs ARRM and MOHR's motion for a temporary restraining order and preliminary injunction, (Dkt. 6), is **DENIED**.


Dated:  June 28, 2018                                    s/Wilhelmina M. Wright
                                                        Wilhelmina M. Wright
                                                        United States District Judge