# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ARRM, a Minnesota non-profit association incorporated under the laws of Minnesota, on behalf of itself and its members; | Case No. 18-cv-1627 (WMW/BRT) |
| Minnesota Organization for Habilitation and Rehabilitation (MOHR), a Minnesota non-profit association incorporated under the laws of Minnesota, on behalf of itself and its members; and | |
| Karla Dee Marder, by her guardian Judy Marder; Robert Clapper, by his guardian James Clapper; Kathryn Smith, by her guardian Gerald Smith; and Cara Pedrelli, by her guardian Nino Pedrelli[1], on behalf of other waiver recipients similarly situated, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| Plaintiffs, | |
| v. | |
| Emily Johnson Piper, in her Official Capacity as Commissioner of the Minnesota Department of Human Services, | |
| Defendant. | |

This matter is before the Court on Defendant's motion to dismiss Plaintiffs'

amended complaint for lack of subject-matter jurisdiction and failure to state a claim on

---

[1]     Although the docket in this case identifies this plaintiff as "Cara Pedrille, by her guardian Nino Pedrille," this spelling appears to be based on a typographical error in the original complaint.  The amended complaint corrects this error, and the Court uses the corrected spelling throughout this Order.

which relief can be granted. (Dkt. 38.) For the reasons addressed below, Defendant's motion is granted and the amended complaint is dismissed without prejudice.

## BACKGROUND

This case involves funding reductions to Minnesota's "waiver services" payment rates. Waiver services are services for which the federal government agrees, in limited circumstances, to waive certain statutory and regulatory requirements that ordinarily would govern Medicaid assistance funding. *See* 42 C.F.R. §§ 430.25, 441.300. The state agency that administers a state's Medicaid program may apply to the Centers for Medicare and Medicaid Services (CMS) for authorization to establish home and community-based waiver services, which are designed to enhance the ability of persons with disabilities to live in the community rather than in an institutional setting. Waiver services are administered by states but jointly funded by state and federal governments.

In Minnesota, the Department of Human Services (DHS) is the state agency responsible for licensing, certifying, and enrolling providers of waiver services. DHS also computes and approves waiver service payment rates according to Minnesota law. The Minnesota Disability Waiver Rate System (DWRS) provides a mathematical framework for establishing provider payment rates for approved waiver services. *See* Minn. Stat. § 256B.4914. Enacted by the Minnesota Legislature, DWRS went into effect on January 1, 2014. Pursuant to DWRS, waiver service payment rates adjust automatically every five years to account for inflation. The first automatic inflationary adjustment occurred on July 1, 2017.

In addition to the DWRS automatic inflationary adjustments, the Minnesota Legislature separately enacted three session laws that increased waiver service payment rates, with effective dates in 2014 and 2015. *See* 2014 Minn. Laws, Ch. 312, Art. 27, § 75; 2013 Minn. Laws, Ch. 108, Art. 7, §§ 34, 60. These session laws, which cumulatively increased waiver service payment rates by 7%, affected all payment rates for Minnesota waiver service recipients without regard for the type of waiver services received or whether the payment rates had been set by DWRS.

During the 2018 legislative session, the Minnesota Legislature passed an omnibus bill that, as relevant here, would have repealed the cumulative 7% waiver service payment rate increase and replaced it with different appropriations. However, Minnesota Governor Mark Dayton vetoed that omnibus bill in May 2018. Consequently, the three session laws that provide for the 7% waiver service payment rate increases remain in effect. Shortly thereafter the Commissioner of DHS, Defendant Emily Johnson Piper (Commissioner), announced that DHS intends to eliminate the 7% waiver service payment rate increase. The elimination of this rate increase will occur in multiple stages. The first funding reduction occurred on July 1, 2018, and the final funding reduction is scheduled to occur on December 31, 2019.

Plaintiffs ARRM and Minnesota Organization for Habilitation and Rehabilitation (MOHR) (collectively, "Organizational Plaintiffs") are nonprofit associations incorporated under Minnesota law. ARRM advances Minnesota's home and community-based service programs that support people living with disabilities, and its members include more than 200 service providers, businesses, and stakeholders, including nonprofit and for-profit

entities that are certified to provide such services. MOHR is an association with more than 100 members that provide services to persons with disabilities. Plaintiffs Karla Dee Marder, Robert Clapper, Kathryn Smith, and Cara Pedrelli, through their respective guardians (collectively, "Individual Plaintiffs"), receive waiver services subject to DWRS. Plaintiffs commenced this action to enjoin the Commissioner from implementing the anticipated 7% funding reduction to Minnesota's waiver service payment rates.

Plaintiffs sought a temporary restraining order and preliminary injunction, which this Court denied in a June 28, 2018 Order. Plaintiffs filed an amended complaint on July 13, 2018. Count I alleges that the Commissioner's 7% funding reduction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Count II alleges that the Commissioner's 7% funding reduction violates the Equal Protection Clause of the Fourteenth Amendment. Count III alleges that the Commissioner's 7% funding reduction violates Title II of the Americans with Disabilities Act (ADA), Title 42, United States Code, Sections 12101 *et seq.* And Count IV alleges that the Commissioner's 7% funding reduction violates the Rehabilitation Act, Title 29, United States Code, Sections 793 *et seq.* The Commissioner moves to dismiss, arguing that this Court lacks subject-matter jurisdiction over Plaintiffs' claims and that the amended complaint fails to state a claim on which relief can be granted.

## ANALYSIS

The Commissioner moves to dismiss Plaintiffs' amended complaint in part pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject-matter jurisdiction over the Individual Plaintiffs' claims because the Individual Plaintiffs lack

standing.  The commissioner also moves to dismiss Plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Under Rule 12(b)(1), a defendant may challenge a plaintiff's complaint for lack of subject-matter jurisdiction either on its face or on the factual truthfulness of its averments. *See* Fed. R. Civ. P. 12(b)(1); *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  In a facial challenge, as presented here, the nonmoving party "receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to state a claim on which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint must allege sufficient facts that, when accepted as true, state a facially plausible claim to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When determining whether the complaint states such a claim, a district court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  The factual allegations need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  A plaintiff, however, must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555.  Legal conclusions that are couched as factual allegations may be disregarded by the district court.  *See Iqbal*, 556 U.S. at 678-79.

## I.     Standing

Because questions of standing implicate the Court's subject-matter jurisdiction, the Court addresses the Commissioner's standing arguments first. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002). The jurisdiction of federal courts extends only to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1; *accord Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). To satisfy the case-or-controversy requirement of Article III of the United States Constitution, a plaintiff must establish standing as an "indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *accord Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790 (8th Cir. 2012). To meet this standing requirement, the plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship between the contested conduct and the alleged injury, and (3) show that a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560-61; *accord Hargis*, 674 F.3d at 790.

The Commissioner argues that the Individual Plaintiffs lack standing as to all of the claims asserted in the amended complaint and that the Organizational Plaintiffs lack standing as to the ADA and Rehabilitation Act claims asserted in the amended complaint. The Court addresses each standing argument in turn.

### A.     Individual Plaintiffs

Because the Individual Plaintiffs have not alleged an imminent injury in fact, the Commissioner argues, the Individual Plaintiffs lack standing to seek injunctive relief.[2] To

---

[2]     In the June 28 Order, the Court dismissed the Individual Plaintiffs' claims to the extent that the claims sought injunctive relief against the Commissioner. Because Plaintiffs

allege an "injury in fact" that confers standing to seek injunctive relief, a plaintiff must face a threat of ongoing or future harm. *Park v. Forest Serv. of the U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). An injury in fact "must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (internal quotation marks omitted). Allegations of a possible future injury are insufficient to confer standing. *Id.*

In *Clapper*, the Supreme Court of the United States held that the plaintiffs lacked standing because a "speculative chain of possibilities" could not establish an injury in fact based on potential future injuries. *Id.* at 414. The plaintiffs sought a declaration that Section 702 of the Foreign Intelligence Surveillance Act of 1978 is unconstitutional and an injunction against surveillance authorized by that section. *Id.* at 401. They attempted to establish an injury in fact based on an objectively reasonable likelihood that their communications would be acquired pursuant to the challenged law at some point in the future. *Id.* Rejecting that argument, the Court observed that the plaintiffs' possible future injury depended on a "highly speculative fear" that a lengthy chain of events would occur:

> (1) the Government will decide to target the communications of non-U.S. persons with whom [plaintiffs] communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many

---

subsequently amended their complaint, the Court addresses the standing issue in light of the allegations in the amended complaint.

safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

*Id.* at 410.

As this Court observed in its June 28 Order, it is undisputed that the waiver services received by Plaintiffs Marder and Smith will not be affected by the Commissioner's anticipated funding reductions, if at all, until December 31, 2019. Because these possible future injuries will not occur for more than nine months, they are not "imminent" as is required to establish Article III standing. Moreover, these injuries are highly speculative given that one or more events could occur in the next nine months that might prevent these alleged injuries from ever arising—including, but not limited to, administrative, legislative, or judicial action. For these reasons, Plaintiffs Marder and Smith have not alleged an injury in fact as is necessary to establish Article III standing to obtain injunctive relief.

Plaintiffs Clapper and Pedrelli allege that the waiver services they receive were affected by the Commissioner's funding reductions beginning on October 1, 2018, and July 1, 2018, respectively. In its June 28 Order, this Court reasoned that, as in *Clapper*, Plaintiffs Clapper and Pedrelli allege possible future injuries that depend on a speculative chain of possibilities that may not occur. Nothing in the amended complaint warrants altering that conclusion now. Although some of the Commissioner's funding reductions have taken effect, the amended complaint does not allege that any waiver service providers have discontinued or otherwise limited the particular waiver services that Plaintiffs Clapper

and Pedrelli receive, or that such discontinuation or limitation will imminently occur.[3] Moreover, the amended complaint alleges that Plaintiff Pedrelli has followed state law procedures to request a rate exception, and that request remains pending.

The amended complaint does not allege a concrete injury that has befallen Plaintiffs Clapper and Pedrelli, and the series of events that would have to occur for an injury to befall them requires an attenuated and speculative chain of inferences.[4]  "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court' " to establish standing based on a *possible* future injury.  *Clapper*, 568 U.S. at 414 n.5 (quoting *Lujan*, 504 U.S. at 562).  The chain of events described above and in the Court's June 28 Order depends, at least in part, on future choices made by independent actors not before this Court, including waiver service providers and administrative agencies.  As in *Clapper*, this "speculative chain of possibilities does not establish that injury based on potential future [occurrences] is certainly impending."  *Id.* at 414.

Plaintiffs contend that, even if the Individual Plaintiffs have yet to demonstrate an injury sufficient to merit an injunction, they also seek declaratory relief that may be considered independently of other forms of relief.  "The essential distinction between a declaratory judgment action and an action seeking other relief is that in the former no actual

---

[3]     Notably, as the Court previously observed in its June 28 Order, the Individual Plaintiffs do not directly receive the waiver service funds at issue here.  Rather, the Individual Plaintiffs receive waiver services from providers, and the providers of those waiver services receive the waiver service funds.

[4]     Notably, at the hearing on the pending motion, Plaintiffs' counsel repeatedly referred to the alleged injuries in speculative terms, such as the *risk* and *fear* of future harms.

wrong need have been committed or loss have occurred in order to sustain the action." *Cty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004) (internal quotation marks omitted). But "[t]he controversy requirement of the Declaratory Judgment Act is synonymous with that of Article III of the Constitution." *Id.* at 463 (internal quotation marks omitted). And a plaintiff seeking declaratory relief must demonstrate that the plaintiff has suffered at least a threatened injury. *See, e.g.*, *id.* at 464 (affirming dismissal of declaratory-judgment action for lack of standing because allegations in the complaint "do not establish an injury in fact" but instead, "[a]t best, . . . reflect speculative harms"). Consequently, the Individual Plaintiffs' standing arguments fare no better with respect to their claims for declaratory relief.

Because the Individual Plaintiffs have not satisfied their burden to demonstrate that their future injuries are certainly impending, as opposed to being mere allegations of possible future injuries, the Individual Plaintiffs lack Article III standing and this Court lacks subject-matter jurisdiction over the Individual Plaintiffs' claims. *See Faibisch*, 304 F.3d at 801 (stating that standing implicates the court's subject-matter jurisdiction); *see also* Fed. R. Civ. P. 12(h)(3) (providing that, if a court determines it lacks subject-matter jurisdiction over a claim, such claims must be dismissed). For these reasons, the Individual Plaintiffs' claims are dismissed without prejudice.

### B. Organizational Plaintiffs

The Commissioner argues that the Organizational Plaintiffs lack standing to pursue claims under the ADA or the Rehabilitation Act. Title II of the ADA prohibits public entities from discriminating against a "qualified individual with a disability . . . by reason

of such disability."   42 U.S.C. § 12132.   The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" shall "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a).

An organization can have standing on its own behalf or on behalf of its members. *See Bowman v. W. Auto Supply Co.*, 985 F.2d 383, 388 (8th Cir. 1993).   An association has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."   *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).   As to the first element, an association can have standing even if only one member has standing.   *Id.* at 342.   But a member's interest cannot be merely "abstract concern" or "unadorned speculation."   *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40, 44 (1976).

The Organizational Plaintiffs allege that they are "analogous to a school district joining a federal action brought by students to enjoin state laws or actions that prevent students from receiving services that comport with constitutional principles."   According to the Organizational Plaintiffs, under their licensing and enrollment requirements, their members must administer services "in a manner that allows all waiver recipients to live in the most integrated setting appropriate to their needs."   The Organizational Plaintiffs assert that their members "hold an indirect right under the ADA that obligates the Defendant to administer the waiver system in a fair and uniform manner that will not frustrate their

[members'] ability and obligation to provide support[] and services in the least intrusive setting."

Because nothing in the amended complaint alleges a direct injury to the Organizational Plaintiffs arising from any violation of the ADA or the Rehabilitation Act, the Organizational Plaintiffs must satisfy the requirements of associational standing on behalf of their members. The Organizational Plaintiffs allege that their members are subject to licensing and enrollment requirements, but they do not allege that their members' licenses have been revoked, suspended, or otherwise threatened. The Organizational Plaintiffs also allege that their members used the 7% funding increase to fund "initiatives" that are required by the ADA and the Rehabilitation Act, thereby suggesting that the Commissioner's 7% funding reduction prevents them from complying with the requirements of the ADA and the Rehabilitation Act. But the amended complaint does not specify what these "initiatives" are, does not allege that any such "initiatives" have been discontinued, and does not allege that any of the Organizational Plaintiffs' members have been disciplined or otherwise suffered adverse consequences based on any noncompliance with the requirements of the ADA or the Rehabilitation Act. As such, the amended complaint alleges no facts that would establish a concrete, particularized, or imminent harm to the Organizational Plaintiffs' members arising from a violation of either the ADA or the Rehabilitation Act.

For these reasons, the Organizational Plaintiffs lack standing as to the ADA and Rehabilitation Act claims asserted in the amended complaint. Accordingly, Count III and

Count IV of the amended complaint are dismissed without prejudice for lack of subject-matter jurisdiction.

## II.     Failure to State a Claim

The Commissioner also argues that the Organizational Plaintiffs' constitutional claims should be dismissed for failure to state a claim on which relief can be granted. The Court addresses each of these claims in turn.

### A.     Due Process (Count I)

Count I of the amended complaint alleges that the Commissioner's 7% funding reduction violates the Due Process Clause of the Fourteenth Amendment. But the amended complaint conflates procedural due process and substantive due process, advancing arguments that embrace both concepts. The Court addresses each due process issue separately.

#### 1.     Procedural Due Process

The Organizational Plaintiffs allege that they have a constitutionally protected property interest in the cumulative 7% waiver service payment rate increase that the Commissioner has now begun to cut. Therefore, the Organizational Plaintiffs contend, the Commissioner's 7% funding reduction violates their right to procedural due process. The Commissioner counters that Plaintiffs' mere expectation of receiving a particular reimbursement rate in the future does not create a protected property interest and that, even if a protected property interest in such a prospective benefit exists, the Organizational Plaintiffs are afforded adequate process under state law.

Procedural due process claims are reviewed in two steps. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006). The first step is to determine whether the plaintiff has been deprived of a protected liberty or property interest. *Id.* "Protected property interests are created by state law, but federal law determines whether the interest rises to the level of a constitutionally-protected property interest." *Ellis v. City of Yankton*, 69 F.3d 915, 917 (8th Cir. 1995). If the plaintiff has a protected property interest, the second step is to consider what process is due by balancing the affected interest, the likelihood that the existing procedures would result in an erroneous deprivation, and the government interest in providing the process it did, including the administrative costs and burdens of providing additional process. *Senty-Haugen*, 462 F.3d at 886 (citing *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976)). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998).

The Due Process Clause does not protect everything that can be described as a "benefit." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). To establish a constitutionally protected property interest in a benefit, "a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Instead, a person must "have a legitimate claim of entitlement" to the benefit. *Id.* (quoting *Roth*, 408 U.S. at 577). And if government officials may grant or deny a benefit in their discretion, the benefit is not a "protected entitlement." *Id.*

The United States Court of Appeals for the Eighth Circuit repeatedly has held that recipients of Medicaid reimbursements do not have a constitutionally protected property interest in a particular reimbursement rate. *See, e.g.*, *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446-47 (8th Cir. 1984) (concluding that, because health care service providers' participation in the Medicaid program is voluntary, dissatisfaction with reimbursement rates cannot give rise to a constitutional claim under the Fifth or Fourteenth Amendment); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 602 F.2d 150, 153-54 (8th Cir. 1979) (concluding that, because plaintiffs provide services to Medicaid recipients voluntarily, if plaintiffs "find that the reimbursement rates are insufficient, then they may either make their homes more efficient and economical or terminate their relationship with Medicaid and no longer accept Medicaid recipients as residents"); *see also Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 965-66 (8th Cir. 2014) (concluding that a medical equipment provider that suffered business losses due to implementation of a Medicare competitive bidding system "possesses no protected . . . property interest that may serve as the basis of a due process violation"). Minnesota courts have reached the same conclusion in analogous contexts. *See, e.g.*, *Highland Chateau, Inc. v. Minn. Dep't of Pub. Welfare*, 356 N.W.2d 804, 811 (Minn. Ct. App. 1984) (concluding that, because "medical assistance participation is voluntary, . . . there can be no due process violation").

The amended complaint does not suggest that the Organizational Plaintiffs' members are involuntary participants in the Medicaid waiver programs at issue here. As such, if they are dissatisfied with the reimbursement rates, they can either operate more

efficiently or terminate their relationship with Medicaid and Medicaid waiver service recipients. *See Minn. Ass'n of Health Care Facilities*, 742 F.2d at 446. That these options may not be economically viable to particular service providers is not legally relevant to assessing whether those providers have a constitutionally protected property interest necessary to support a procedural due process claim. *See id.* (rejecting argument that "business realities prevent nursing homes from leaving the Medicaid program voluntarily" because despite a "strong financial inducement to participate in Medicaid, a [provider's] decision to do so is nonetheless voluntary").

The Organizational Plaintiffs contend that these decisions are distinguishable because this case involves a "pre-approved" reimbursement rate. But because these decisions primarily rely on the voluntariness of a provider's participation in a Medicaid reimbursement program, not whether the reimbursement rate had been "pre-approved," this argument is unavailing.[5]

Moreover, a benefit that may be granted or denied at the discretion of a government official is not a constitutionally protected property interest. *Town of Castle Rock*, 545 U.S. at 756. Here, although the three session laws that increased waiver service payment rates by 7% use the nondiscretionary term "shall," that language must be read in context of the overall statutory scheme. *See id.* at 758-66 (analyzing "mandatory" statutory language in

---

[5]     The Organizational Plaintiffs' reliance on *Good Neighbor Care Centers, Inc. v. Minnesota Department of Human Services* is misplaced. 428 N.W.2d 397 (Minn. Ct. App. 1988). That case involved a rate reduction imposed by DHS as a *sanction*, but otherwise acknowledged that a service provider generally does not have a property interest in any particular reimbursement rate. *See id.* at 405. *Good Neighbor*, therefore, is inapposite.

a broader context and concluding that the benefit conferred by state law was not a constitutionally protected property interest). The state laws governing the waiver program give the Commissioner a certain degree of discretion and require her to balance a variety of sometimes competing interests with respect to her operation of DHS and the waiver program. *See, e.g.*, Minn. Stat. § 245.03, subd. 2 (duty to operate DHS efficiently); Minn. Stat. § 256B.041, subd. 4 (duty to comply with federal requirements to maximize federal financial participation); Minn. Stat. § 256B.4912, subd. 2(a) (duty to establish a single payment methodology tied to costs and ensuring quality of care). Although this Court need not decide whether the Commissioner has exceeded her authority in this instance, the fact that Minnesota law gives the Commissioner a degree of discretion and competing duties with respect to her operation of the waiver program further demonstrates that a particular reimbursement rate is not a constitutionally protected property interest.[6]

For these reasons, the Organizational Plaintiffs fail to state a procedural due process claim.

### 2.     Substantive Due Process

The Organizational Plaintiffs also allege that the Commissioner's 7% funding reduction "shocks the conscience" and violates their right to substantive due process. In response, the Commissioner argues that, even if her decision to implement the 7% funding reduction were legally erroneous, it does not "shock the conscience" as required to advance a substantive due process claim.

---

[6]     In light of this conclusion, the Court need not address whether Plaintiffs have been afforded adequate process under state law.

The due process clauses of the Fourteenth Amendment protects "individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). "To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the contemporary conscience." *Id.* (internal quotation marks omitted). A fundamental right is a right that is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted).

Courts must exercise extreme caution when elevating particular interests to the status of fundamental constitutional rights, because recognizing these rights, "to a great extent, place[s] the matter outside the arena of public debate and legislative action" and risks transforming the Due Process Clause into the Court's policy preferences. *Id.* at 720. When determining whether a claimed right is fundamental, courts require "a careful description of the asserted fundamental liberty interest." *Id.* at 721 (internal quotation marks omitted). Vague generalities are insufficient. *Chavez v. Martinez*, 538 U.S. 760, 776 (2003). Here, Plaintiffs do not attempt to carefully describe the asserted fundamental liberty interest in either their amended complaint or their memorandum of law, and the Court discerns none. Plaintiffs also do not explain how their asserted entitlement to a particular reimbursement rate is "deeply rooted in this Nation's history and tradition and

implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21 (internal citations omitted).

Even if Plaintiffs could identify a fundamental right at issue here, they also must allege that the Commissioner's conduct shocks the conscience. Whether a government official's actions shock the conscience is a question of law. *Hayes v. Faulkner Cty.*, 388 F.3d 669, 674-75 (8th Cir. 2004). "To satisfy the conscience-shocking standard, a government official's conduct must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Hall v. Ramsey Cty.*, 801 F.3d 912, 917-18 (8th Cir. 2015) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847-48 n.8 (1998)). Conduct that is "intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento*, 523 U.S. at 849. For this reason, courts recognize "only the most egregious official conduct . . . [as] arbitrary in the constitutional sense." *Id.* at 846 (internal quotation marks omitted).

Here, beyond conclusory statements, the Organizational Plaintiffs do not attempt to show how the Commissioner's conduct shocks the conscience. Even assuming that the Commissioner's 7% funding reduction is not authorized by law, as the Organizational Plaintiffs contend, nothing in the amended complaint suggests that the Commissioner's conduct was intended to injure the Organizational Plaintiffs without any justifiable government interest or was otherwise so egregious as to be conscience-shocking. At most, the amended complaint alleges that the Commissioner chose between conflicting statutory

obligations. Even if the Commissioner's choice was legally erroneous, it was not conscience-shocking.

For these reasons, the Organizational Plaintiffs fail to state a substantive due process claim. Accordingly, Count I of the amended complaint is dismissed without prejudice.

## B. Equal Protection (Count II)

The Organizational Plaintiffs allege that the Commissioner's conduct violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. According to the Organizational Plaintiffs, the cumulative 7% waiver service payment rate increase "continue[s] to be paid to other, similarly situated continuing care providers." The Organizational Plaintiffs also claim that the Commissioner routinely affords similarly situated providers "the opportunity to appeal payment rates" while denying that opportunity to the Organizational Plaintiffs.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause requires state actors to treat similarly situated persons alike, but state actors do not run afoul of the Equal Protection Clause if they treat dissimilarly situated persons dissimilarly." *Am. Family Ins. v. City of Minneapolis*, 836 F.3d 918, 921 (8th Cir. 2016). To state an equal-protection claim, a plaintiff must allege that the plaintiff was "treated differently than other persons who were in all relevant respects similarly situated." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 820 (8th Cir. 2011) (internal quotation marks omitted). As the Organizational Plaintiffs are not members of a suspect class and

their claims do not allege the violation of a fundamental right, their equal-protection claim is subject to rational basis review. *Am. Family Ins.*, 836 F.3d at 921.

The allegedly "similarly situated" providers identified in the amended complaint are skilled nursing facilities and intermediate care facilities for persons with developmental disabilities. But the amended complaint alleges that the services and programs provided by these "similarly situated" facilities are "non-DWRS waiver services or programs," unlike the Organizational Plaintiffs' members, which provide DWRS waiver services and programs.[7] This distinction is significant, according to the amended complaint, because the Commissioner's decision to eliminate the 7% funding increase to Organizational Plaintiffs' members was based on the conclusion that the 7% funding increase was duplicative of the automatic 8.2% inflationary increase that those providers received under DWRS.

The Organizational Plaintiffs concede that the facilities that provide non-DWRS services and programs "have their payment rates established under different mathematical formulae." The Organizational Plaintiffs contend that their members nonetheless are similarly situated to those facilities because "those different formulae share several similarities" such as complexity, the use of cost data collected by DHS, and enforcement by DHS. But according to the amended complaint, only providers subject to the DWRS framework received the 8.2% inflationary adjustment. As such, those providers are not

---

[7]     Moreover, the providers of non-DWRS services received rate increases *similar to* the 7% increases, but the amended complaint suggests that these increases were *not* pursuant to the same session laws that established the 7% funding increase applicable to the Organizational Plaintiffs' members.

similarly situated to non-DWRS service providers that did *not* receive an 8.2% inflationary adjustment. Because skilled nursing facilities and intermediate care facilities for persons with developmental disabilities do not provide DWRS services and are not subject to the same reimbursement rate formulae as the Organizational Plaintiffs' members, they are not "in all relevant respects similarly situated," as is required to state an equal-protection claim. *Schmidt*, 655 F.3d at 820 (internal quotation marks omitted).

Because the Organizational Plaintiffs fail to state an equal-protection claim, Count II of the amended complaint is dismissed without prejudice.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.      Defendant's motion to dismiss, (Dkt. 38), is **GRANTED**.

2.      Plaintiffs' amended complaint, (Dkt. 36), is **DISMISSED WITHOUT PREJUDICE**.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  February 15, 2019                                    s/Wilhelmina M. Wright
                                                             Wilhelmina M. Wright
                                                             United States District Judge